1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

YEISER RESEARCH &
DEVELOPMENT LLC,

                              Plaintiff,

        v.


TEKNOR APEX COMPANY,

                              Defendant.

Case No. 17-cv-1290-BAS-RBB

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S RULE 12(b)(6)
MOTION TO DISMISS THE
COMPLAINT**

**[ECF No. 16]**

The dispute before the Court concerns Plaintiff Yeiser Research & Development LLC's ("YRD") allegations that Defendant Teknor Apex Company ("Teknor") unlawfully used YRD's confidential information to develop and market Teknor's Zero-G Hose.  In late 2013, YRD, an experienced developer of compact garden hoses, began sharing its information with Teknor, a manufacturer which allegedly had no prior experience in building or marketing such hoses.  The parties subsequently entered into a Confidentiality Disclosure Agreement ("CDA") to protect the confidentiality of information YRD shared with Teknor.  The CDA stated that any future joint projects would be governed by a Joint Development Agreement ("JDA").  Although the parties allegedly discussed a potential joint project, they

never carried out the project, nor entered into a JDA.  YRD subsequently brought suit against Teknor.  Presently before the Court is Teknor's Rule 12(b)(6) motion to dismiss all seven claims YRD raises.  (ECF No. 16.)  YRD has opposed (ECF No. 22)[1] and Teknor has replied (ECF No. 21).  For the reasons stated below, the Court grants in part and denies in part Teknor's Rule 12(b)(6) motion.

## I.     BACKGROUND

### A.     Factual Background

Plaintiff YRD, a family business, is a California company, which created a new retail market for compact garden hoses in the 2000s.  (ECF No. 1-2 Ex. A (hereinafter "Compl.")  ¶2.)    Defendant Teknor is a privately-held Delaware corporation that sells rubber products and has an international presence with extensive retail distribution channels.  (*Id*. ¶¶3, 7.)

In 2013, Teknor approached YRD through a common customer regarding development of a better compact hose than existed on the market.  (*Id*. ¶7.)  Although Teknor touted its position in the industry as a major hose manufacturer, Teknor indicated that it had no prior experience building or manufacturing compact hoses, and wanted either to purchase such a hose from YRD or jointly develop one for Walmart and other customers.  (*Id*. ¶¶7–8.)  YRD educated Teknor on the industry standard approach to flat or collapsible hoses and YRD's methods for building hoses, the strengths and weaknesses of the hoses on the market, and YRD's current and recommended marketing methods for building and marketing a new collapsible compact hose.  (*Id*. ¶8.)  YRD had recently solved technical issues with existing compact hoses on the market, and had effective marketing ideas.  (*Id*. ¶11.)  John Yeiser (YRD) noted to Michael Melo (Teknor) that Teknor would be an ideal business partner to commercialize what YRD had already discovered.  (*Id*. ¶9.)  Yeiser shared his expectation that the parties would establish a JDA for any future

---

[1] The Court relies on YRD's corrected opposition to Teknor's motion to dismiss, which the Court permitted YRD to file.  (ECF No. 20.)

1    joint commercialization, with a royalty term for YRD of either $1.50 per product sold

2    or 10% of all Teknor sales.  (*Id*.)  Teknor acknowledged this expectation.  (*Id*.)

3         The parties negotiated a CDA over the course of several months, which was

4    finally executed on January 28, 2014.  (*Id.* ¶11; Ex. 1 (hereinafter "CDA").)  The

5    CDA's purpose was to permit disclosure of confidential information between the

6    parties in order to collaborate and share ideas pertaining to product development.

7    (CDA §1.)  The CDA's confidentiality provisions excluded information that was

8    already in the public domain, a party's possession at the time of disclosure, disclosed

9    by a third party, or independently developed.  (*Id.* ¶12; CDA §§2, 3(a)–(d).)

10   However, the CDA's five-year non-competition clause, Section 4(g), required certain

11   excluded information to be treated as confidential under certain circumstances.

12   Except for information independently developed, if a party receiving information

13   designated as confidential failed to "immediately notify" the disclosing party in

14   writing that the information was subject to an exclusion, the information could not

15   be used to compete for a term of five years, including from the date of the CDA's

16   termination.  (*Id.* ¶12; CDA §§4(g), 8.)

17        With the CDA in place, YRD provided prototype images, information about

18   product performance, commercialization evaluation, and marketing ideas.  (Compl.

19   ¶13.)  Between February 2014 and March 2014, Yeiser confirmed with Melo that

20   Teknor considered this information to be new ideas under Sections 3(a)–(c) and

21   Section 4(g) of the CDA.  (*Id.* ¶¶13–14.)  In mid-March 2014, YRD relied on

22   Teknor's confirmation and provided more information, including detailed sales

23   sheets and sales data, test results for confidential sleeve concepts, designs with

24   multiple variations, prototypes and samples, and marketing ideas.  (*Id.* ¶¶15, 17, 18.)

25   YRD disclosed the sales advantages of its new concept hose, which existed nowhere

26   on the market.  (*Id.* ¶18.)  Teknor acknowledged that the majority of this information

27   was subject to the CDA's confidentiality provisions and Section 4(g).  (*Id.* ¶¶15, 17,

28   19.)  YRD's disclosures reflected its "revolutionary approach" for a new compact

hose and a "breakthrough" consisting of a confidential new interior design and use of a heavy duty outer casing to yield a higher quality, more reliable hose than the existing hoses comprised of cheap materials and thin fabrics. (*Id.* ¶¶16, 17, 22.) The design provided added protection from punctures and reduced fatigue from clamping—features that were key to overcoming the stigma associated with the industry standard expandable flat hose. (*Id.* ¶¶17, 22–23.) YRD advised Teknor that it was developing for sale a new changed, interior hose design based on its disclosures to Teknor and sent Teknor prototypes. (*Id.* ¶18.)

Teknor subsequently decided to commercialize part of YRD's new hose design. (*Id.* ¶19.) Between March and April 2014, the parties had discussions about expanding their relationship, covering marketing, manufacturing, and costs. (*Id.* ¶¶20–21.) Teknor would mass produce the new hose under discussion, YRD would market through its longstanding relationship with QVC, and Teknor would market to its retail channels, starting with YRD's existing product. (*Id.* ¶20.) Thereafter, Melo solicited information on various production scenarios, which YRD provided subject to the CDA and which Teknor did not dispute was confidential. (*Id.* ¶21.) In July 2015, over a year after the parties' discussions, Yeiser asked Melo about whether Teknor was interested in another hose concept. (*Id.* ¶24.) But Melo was not, nor was Teknor working on anything new or outside of its core business. (*Id.*) Teknor subsequently cancelled YRD's planned introduction and presentation to QVC. (*Id.*) The CDA remained in place as did the alleged plans for a JDA. (*Id.*)

Enter Teknor's Zero-G Hose: a hose that includes an elastic inner layer, a slip coating layer with lubricating properties that increase the life of the hose, and an outer sheath that covers the inner tube and slip coating layer. (*Id.* ¶25.) The Zero-G Hose's promotional information touted product attributes based on the confidential information YRD provided, including the hose's puncture resistance, kink-reducing design, pliable inner core, and durability. (*Id.* ¶¶23, 27.) YRD alleges that the majority of the hose's features pirated YRD's new compact hose concept. (*Id.* ¶¶25,

27.)  While soliciting and receiving confidential information from YRD, Teknor, through Melo, was allegedly actively concealing its plan from the outset to pirate YRD's confidential information to develop and sell its own competing compact hose to retailers.  (*Id.* ¶¶25–28.)  By fall 2015, Teknor allegedly had begun secret discussions with Lowes and other retailers to sell its own compact hose.  (*Id.* ¶26.)  YRD now faces competition from Teknor and the Zero-G Hose.  (*Id.* ¶40.)

### B. Procedural Background

On May 23, 2017, YRD brought suit against Teknor in California Superior Court, alleging that Teknor breached multiple provisions of the CDA (Count 1), misappropriated YRD's trade secrets (Count 2), was unjustly enriched by failing to negotiate the JDA (Count 3), converted YRD's confidential and proprietary information (Count 4), interfered with YRD's prospective economic advantage (Count 5), engaged in unfair competition by using YRD's confidential and proprietary information (Count 6), and breached the implied covenant of good faith and fair dealing by failing to negotiate the JDA (Count 7).  (Compl. ¶¶29−88.)  YRD seeks damages, restitution, and injunctive relief against Teknor.  (*Id.* Prayer for Relief.)  Teknor subsequently removed the complaint to this District Court (ECF No. 1) and now seeks dismissal of the Complaint in its entirety (ECF No. 16-1).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (internal quotations omitted).  A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  For the purposes of such a motion, the court accepts as true the allegations in the complaint and construes those allegations in the light most favorable to the plaintiff.  *Hishon v. King &*

*Spalding*, 467 U.S. 69, 73 (1984).  To survive a Rule 12(b)(6) motion, a plaintiff is required to set forth "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Factual allegations must be enough to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555.  The court need not accept as true legal conclusions pleaded in the guise of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994).  Relatedly, a pleading is insufficient if it offers only "labels and conclusion" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 676.  In ruling on a 12(b)(6) motion to dismiss, a court may consider materials properly submitted as part of the complaint. *Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).

## III.   DISCUSSION

### A.   Delaware Law Governs the Claims in this Case

Teknor argues that Delaware laws governs all of the claims in this action because the CDA contains a valid choice-of-law provision that is enforceable under California law.  (ECF No. 16-1 at 7.)  Teknor contends that Delaware law also applies to YRD's tort claims because they relate to the common nucleus of facts centering on Teknor's alleged misuse of confidential information exchanged under the CDA.  (*Id.* at 8.)

A federal court sitting in diversity must apply the forum state's choice-of-law rules to determine the controlling substantive law. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005).  Federal courts sitting in diversity in California follow California choice-of-law rules. *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009).  Like federal courts in the Ninth Circuit, California state courts look to the Restatement (Second) of Conflicts of Law (1971) for the choice of law rules. *See*

*In re Zukerkon*, 484 B.R. 182, 188 (9th Cir. 2012); *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1151 (Cal. 1992).  Section 187 of the Restatement applies if parties have entered into an agreement, negotiated at arm's-length, which selects a particular state's law to govern their contractual relationship.  *See Nedlloyd*, 834 P.2d at 1151.  To determine whether the choice-of-law provision is enforceable, a court must engage in a two-step analysis.  First, the court must determine whether: (1) the chosen state has a substantial relationship to the parties or their transaction, or (2) there is any other reasonable basis for the parties' choice of law.  *Id.* at 1152.  Second, if either is shown, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California.  *Id.*  Because Teknor has advocated application of Delaware law pursuant to the CDA's choice-of-law provision, it has the burden of establishing either a substantial relationship or reasonable basis.  *See Pulte Home Corp. v. Am. Safety Indem. Co.*, No. 16-cv-02567-H-AGS, 2017 WL 3007215, at *3 (S.D. Cal. July 14, 2017); *see also Wash. Mut. Bank v. Superior Court*, 15 P.3d 1071, 1078 (Cal. 2001).

Teknor has easily met this burden.  The CDA contains a choice-of-law provision which selects Delaware law as the governing substantive law of the CDA.  (CDA §12(b).)  The parties to a contract have a substantial relationship with the chosen state if at least one of them is incorporated there.  *See Nedlloyd*, 834 P.2d at 1153; *Hambrecht & Quist Venture Partners v. Am Med. Int'l, Inc.*, 46 Cal. Rptr. 2d 33, 41–42 (Cal. Ct. App. 1995).  Because Teknor is a company incorporated in Delaware (Compl. ¶3), there is a substantial relationship between Delaware and the parties.  Teknor's incorporation in Delaware also provides a reasonable basis for the parties' selection of Delaware law.  *Nedlloyd*, 834 P.2d at 1153; *Hambrecht*, 46 Cal. Rptr. 2d at 42.  Once the party advocating application of a choice-of-law provision has met its burden, the burden shifts to the opposing party to show that application would violate a fundamental policy of California.  *Pulte Home Corp.*, 2017 WL 3007215, at *3.  YRD concedes in opposition that Delaware law is not contrary to a

fundamental policy of California (ECF No. 22 at 11), nor can this Court conclude that application of Delaware law to YRD's contract claims would violate California public policy. *See Hatfield*, 564 F.3d at 1183 (there was "no basis in the record to conclude" that applying English law would violate California public policy). Accordingly, the Court will apply Delaware law to YRD's breach of contract claims.

Delaware law applies to YRD's remaining claims as well. (ECF Nos. 16-1 at 8–9; 22 at 10–11.) California courts will apply an enforceable contractual choice-of-law provision to claims "arising from or related to" the contract, *Nedlloyd*, 834 P.2d at 1153; *see also VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1047 (N.D. Cal. 2006) (*Nedlloyd* "supports Defendants' position that this Court should apply Minnesota law to the trade secret claim" where choice of law provision selected Minnesota law). This is especially true when "the legal relationship between the[] parties emanates from th[e] Agreement and the interpretation of the Agreement will be a central issue" in the case. *Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 278–79 (Cal. Ct. App. 2006) (concluding that New York law applied to FEHA and wrongful discharge claims pursuant to a choice-of-law clause in the agreement which established the parties' legal relationship). In this case, the legal relationship between YRD and Teknor emanates from the CDA and all of YRD's claims are "inextricably intertwined with the construction and enforcement of th[at] Agreement." *Id*. at 279. Accordingly, Delaware law applies to YRD's remaining claims.

In anticipation of this result, Teknor contends that Counts 2 through 7 should be dismissed because they are not pleaded under Delaware law. (ECF No. 16-1 at 9.) This argument is unavailing. As YRD correctly observes (ECF No. 22 at 9–10), the focus of the Federal Rules is on whether the factual allegations of the Complaint—not the precise pleading of a specific statute or law—provide Teknor with fair notice of the claims asserted against it. *Twombly*, 550 U.S. at 555; *see also Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (Rule 8(a)(2) "indicates that a basic objection of the rules is to avoid civil cases turning on technicalities."); *Albert*

*v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.")  YRD's failure to plead its claims under Delaware law did not deprive Teknor of fair notice of potential claims that might arise from YRD's factual allegations.  It is those allegations which may or may not state a claim under Delaware law.

### B.      Count 1:  Teknor's Alleged Breaches of the CDA

In Count 1, YRD alleges Teknor breached Sections 4(a)–(d), 4(f), 4(g) and 9 of the CDA, resulting in damages.  (Compl. ¶¶32–38, 40.)  To state a claim for breach of contract under Delaware law, a plaintiff must plead: "(1) the existence of the contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff."  *Avaya Inc., RP v. Telecom Labs, Inc*., 838 F.3d 354, 390 (3d Cir. 2016) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 612 (Del. 2003)).  "Recovery is limited to those damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made."  *Tackett v. State Farm Fire & Cas. Ins. Co*., 653 A.2d 254, 265 (Del. 1995).  Teknor does not dispute the existence of a contract, but rather contends that YRD has failed to plead the second element as to all purported breaches of the CDA.  (ECF No. 16-1 at 21.)

### 1.  Breaches of Sections 4(a) and (b) Are Adequately Pleaded

Teknor argues that YRD's breach of contract claim premised on breaches of Sections 4(a) and 4(b) fails because YRD does not plead that the information disclosed was "Confidential Information," as defined in Section 2 of the CDA.  (ECF No. 16-1 at 24–25.)  Section 2 of the CDA defines "Confidential Information" as "all non-public business and/or technical information disclosed by a Party" who "considers it to be confidential and proprietary."  (CDA §2.)  The CDA provides non-exhaustive examples of confidential information, including "information regarding composition, formulation, raw materials, samples, manufacturing/processing

1   information, packaging, sales and marketing information, and business plans and/or

2   activities."  (*Id.* §2(a).)   Section 3 excludes certain information from Section 2,

3   including information that is public, in the receiving party's possession, received

4   from a third party, or developed independently.  (*Id.* §§3(a)–(d).)

5        Teknor argues that YRD does not allege that the information used in violation

6   of Section 4(a) was confidential information under Section 2.  (ECF No. 16-1 at 25.)

7   Section 4(a) provides that "[e]ach party agrees only to use the Confidential

8   Information in service of the Purpose."  (CDA §4(a).)   The provision solely

9   incorporates the CDA's general definition of confidential information under Section

10  2 subject to the exclusions in Section 3.  YRD generally alleges that its disclosures

11  were confidential under the "provisions of the CDA" or "under the CDA protocol,"

12  without differentiation.  (Compl.  ¶¶15, 18–19, 21, 26.)   These factual allegations

13  encompass Sections 2 and 3 of the CDA.  Assuming the truth of YRD's allegations,

14  the Court can reasonably infer that the information was confidential pursuant to these

15  provisions.  Accordingly, YRD has sufficiently pleaded that Teknor breached Section

16  4(a) by using confidential information in violation of the provision.

17        Similarly, the Court finds that YRD has sufficiently pleaded a breach of

18  Section 4(b).  Teknor argues that YRD's general allegation that Teknor's disclosure

19  of YRD information to third parties fails on its face to plead that the information

20  disclosed was confidential under Section 2.  (ECF No. 16-1 at 24.)   Section 4(b)

21  generally prohibits a party from disclosing "Confidential Information" to a third party

22  unless that party takes certain actions, such as, in relevant part, by requesting

23  permission from the party who initially disclosed the information.  (CDA §4(b).)

24  Like Section 4(a), the provision solely relies on Section 2's definition of

25  "Confidential Information."   Contrary to Teknor's argument, YRD alleges that

26  Teknor "transmitt[ed] information provided to [Teknor] by YRD under the CDA, to

27  third parties including retailers Lowes, Walmart, Target, and Home Depot without

28  permission to do so from YRD" and "without even alerting those third parties that it

was transmitted YRD Confidential Information." (Compl. ¶36.) The Court can reasonably infer that the information referenced in this allegation is confidential under Section 2 of the CDA. Teknor's argument that the purported breach of Section 4(b) is otherwise unsupported by any other allegations in the Complaint is also unavailing. (ECF No. 16-1 at 24–25.) YRD alleges that Teknor began discussions with Lowes and other retailers to sell the compact hose concept learned from YRD's confidential information under the CDA, while actively concealing those efforts from YRD. (Compl. ¶¶26– 27.) The Court must assume the truth of these allegations, which identify Teknor's conduct that allegedly breached Section 4(b). Accordingly, the Court denies Teknor's motion to dismiss YRD's breach of contract claim premised on breaches of Section 4(a) and 4(b).

## 2. Alleged Breaches of Sections 4(c), 4(d) and 4(f) are Insufficiently Pleaded

Teknor argues that YRD provides no factual allegations supporting alleged breaches of Sections 4(c), (d), and (f). (ECF No. 16-1 at 24.) The Court agrees. The Complaint contains no factual allegations that Teknor: (1) "chemically analyze[d]" or "reverse engineer[ed] samples received from" YRD, (CDA §4(c)); (2) failed "to exercise the same degree of care as it employs for protection of its own proprietary information" or failed "to restrict disclosure of Confidential Information to only those employees who have a need to know such information to carry out the Purpose," (*id.* §4(d)); or (3) "fil[ed] a patent application incorporating any of" YRD's allegedly "Confidential Information disclosed pursuant to th[e CDA]," (*id.* §4(f)). In opposition, YRD contends that its allegations are sufficient to show breaches of Sections 4(c) because of Teknor's alleged pitch to retailers of Teknor's hose and 4(f) because Teknor allegedly published confidential information learned from YRD. (ECF No. 22 at 28.) These contentions bear no relation to the CDA provisions at issue, nor the factual allegations in the Complaint. Federal Rule of Civil Procedure 8 requires YRD to offer more than conclusory allegations regarding alleged breaches

1   of Sections 4(c), (d), and (f) to provide fair notice to Teknor.  *See Twombly*, 550 U.S.

2   at 555.  Accordingly, the breach of contract claim is dismissed as to these alleged

3   breaches.

### 3.  Section 4(g) is a Partially Unenforceable Restrictive Covenant

5   Teknor argues that Section 4(g) of the CDA is an unenforceable non-

6   competition restrictive covenant because it facially prohibits competition based on

7   information that may not be YRD's confidential information.  (ECF No. 16-1 at 21–

8   23.)  Teknor contends that YRD's breach of contract claim pertaining to Section 4(g)

9   therefore must be dismissed.  The Court agrees that this provision is in part

10  unenforceable as written, but YRD has pleaded sufficient facts to sustain a claim

11  against Teknor premised on the portion that is enforceable.

12  Under Delaware law, a restrictive covenant, such as a non-competition

13  provision, is enforceable if: (1) it meets general contract law requirements, (2) is

14  reasonable in scope and duration, (3) advances a legitimate economic interest of the

15  party enforcing the covenant, and (4) survives a balance of the equities.  *Kan-Di-Ki,*

16  *LLC v. Suer*, No. 7937-VCP, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015).

17  Section 4(g) prohibits a party from using "Confidential Information" received from

18  a party to compete with the disclosing party for a period of five years from the date

19  of a given disclosure.  (CDA §4(g).)  The remainder of Section 4(g) dictates that, for

20  the purposes of non-competition, "Confidential Information" may include

21  information that is public, was already in the receiving party's possession at the time

22  of the disclosure, or was disclosed to the receiving party by a third party.  (*Id.* §§3(a)–

23  (c), 4(g).)  The non-competition covenant treats such information as confidential if

24  the receiving party fails to provide an immediate notification that the information it

25  received was already disclosed to the party through any of those means.  (*Id.* §4(g).)

26  Thus, Section 4(g) expands the scope of the CDA's general confidentiality provisions

27  to include information that may not in fact be YRD's own confidential information.

28  Teknor argues that Section 4(g) is facially unenforceable and advances no

– 12 –

legitimate economic interest because of the expansive reach of its terms.  (EF No. 16-1 at 22.)  Delaware law recognizes that a business has a legitimate economic interest in protecting the confidentiality of *its* confidential proprietary information.  *See Kan-Di-Ki, LLC*, 2015 WL 4503210 at *20; *Tristate Courier & Carriage, Inc. v. Berryman*, No. 20574-NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004); *Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992).  The first sentence of Section 4(g), like other provisions of the CDA, tracks this legitimate interest by prohibiting Teknor from competing with YRD based on YRD's own confidential information, and vice versa.  But the remainder of Section 4(g) steps beyond YRD's legitimate purpose in protecting *its* confidential information by prohibiting Teknor from competing based even on information that is not in fact YRD's confidential information.  Thus, the remainder of Section 4(g) can "serve[] no purpose, save stifling fair competition" and "crippling" Teknor's legitimate interest to compete with information that is not in fact YRD's.  *See Unisource Worldwide v. Swope*, 964 F. Supp. 2d 1050, 1065 (D. Ariz. 2013).

However, the Court cannot say that the duration and scope of the non-competition clause would otherwise be unreasonable if solely limited to YRD's own confidential information.  Delaware law has found non-competition covenants with similar or even longer duration reasonable.  *See, e.g., Tull v. Turek*, 147 A.2d 658, 663–64 (Del. 1958); *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *19 (five-year term and geographic scope of 23 states in a stock sale agreement reasonable); *O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011) (finding reasonable four-year non-compete covering the entire United States).  Although the non-competition covenant contains no express geographical term, Delaware law treats restriction of activities that are "in competition with" a business as "inherently establish[ing] a geographic limit" that can protect legitimate economic interests.  *See Del. Express Shuttle, Inc. v. Older*, No. 19596, 2002 WL 31458243, at *13 (Del. Ch. Oct. 23, 2002); *Tristate*, 2004 WL

– 13 –

835886, at *11.  Section 4(g)'s prohibition on Teknor from competing with YRD similarly contains an implicit geographic scope as to those areas in which YRD conducts business.

As Teknor acknowledges (ECF No. 16-1 at 22), Delaware law will enforce a restrictive covenant to the extent it is reasonable to do so.  *See Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969); *see also RHIS, Inc. v Boyce*, No. 18924, 2001 WL 1192203, at *6 (Del. Ch. Sept. 26, 2001) (Under Delaware law, a restriction will not be enforced "that is more restrictive than . . . legitimate interests justify.").  YRD suggests that this Court can "blue pencil" Section 4(g) to reform it in an equitable manner that makes it enforceable.  (ECF No. 22 at 27.)  At least one federal district court has found that Delaware law permits blue penciling of restrictive covenants.  *See WebMD Health Corp. v. Dale*, No. 11-5827, 2012 U.S. Dist. LEXIS 112842, at *9 (E.D. Pa. Aug. 10, 2012) ( "Delaware courts themselves 'blue pencil' restrictive covenant agreements that may be otherwise unenforceable, if the equities so dictate.") (citing *RHIS, Inc.*, 2001 WL 1192203, at *7).  Without expressly referencing the "blue pencil" test, Delaware courts have modified non-compete provisions to make them reasonable, or recognize that such modification is permissible.  *See Knowles-Zeswitz Music*, 260 A.2d at 176 (plaintiff could seek enforcement of narrower geographic area than specified in covenant); *Hammermill Paper Co. v. Palese*, No. 7128, 1983 WL 19786, at *6 (Del. Ch. June 14, 1983) (modification of non-compete provision "is permissible under this State's laws concerning the review of such contracts."); *see also FBK Partners, Inc. v. Thomas*, Civil No. 09-292-GFVT, 2010 U.S. Dist. LEXIS 124579, at *16–17 (E.D. Ky. Nov. 23, 2010) ("Delaware courts occasionally modify non-competes that impose broader restrictions than necessary.").  In considering the equities, Delaware courts have found that the equities are less favorable to reforming an overly broad restrictive covenant an employer includes in an employment agreement, particularly with low-level employees, given "disparities in resources, bargaining power, and access to

information." *See Del. Elev., Inc. v. Williams*, No. 5596-VCL, 2011 WL 1005181, at *10 (Del. Ch. Mar. 16, 2011) ("The threat of losing all protection gives employers an incentive to restrict themselves to reasonable clauses."). The equities are different where two sophisticated business parties with relatively equal bargaining power, like YRD and Teknor, have agreed to a restrictive covenant. *See Kan-Di-Ki, LLC*, 2015 WL 4503120, at *20 (upholding restrictive covenant because "there was nothing inequitable about allowing [the party] to enforce the Restrictive Covenants for which [the parties] bargained."). Considering the equities between the parties, the Court finds that Section 4(g) may be equitably reformed to make its enforcement reasonable by limiting its scope to "Confidential Information" as defined in Section 2 subject to the exclusions in Section 3.[2] In this way, YRD's legitimate economic interest in protecting its own confidential information is advanced while Teknor is not subjected to an unreasonable restraint on its ability to fairly compete with YRD.

YRD has pleaded sufficient facts to support its claim that Teknor violated the non-competition covenant in its enforceable form. The Court has already found that YRD has pleaded sufficient facts showing that it provided confidential information to Teknor under the CDA. YRD further alleges that Teknor is now competing with YRD based on information it received under the CDA. (Compl. ¶¶1, 24–28, 35.) The Court is mindful of Teknor's concern that some information it received was not in fact YRD confidential information and that YRD's claim may fail on the merits to the extent this proves to be true. At this stage of the proceedings, however, the Court is required to take as true YRD's allegations. Accordingly, the Court denies Teknor's

---

[2] Moreover, the CDA contains a severability clause which provides that if any provision is found to be unenforceable, in whole or in part, the remaining provisions are not in any way affected or impaired. (CDA §12(f).) The Court's modification of Section 4(g) is consistent with the express intention of the parties to permit and accept judicial modification of the contract's terms. *See Hammermill Paper Co.*, 1983 WL 19786, at *6 (judicial modification of non-compete clause was consistent with parties' agreement).

1  motion to dismiss the breach of contract claim premised on Section 4(g).

### 4. Section 9 is an Unenforceable Agreement to Agree

Teknor argues that YRD's claim for a breach of Section 9 should be dismissed because (1) the provision did not require Teknor to negotiate a JDA and (2) it is an unenforceable agreement to agree.  (ECF No. 16-1 at 16, 25.)  "It is a well-settled principle of Delaware law that an agreement to agree in the future without any reasonably objective controlling standards is unenforceable."  *Heritage Homes of De La Warr, Inc. v. Alexander*, No. 1399-K, 2005 WL 2173992, at *3 (Del. Ch. Sept. 1, 2005), *aff'd*, 900 A.2d 100 (Del. 2006) (internal quotations omitted).  Delaware law, like most jurisdictions, requires that, "to be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations."  *Id.*; *see also Ramone v. Lang*, No. 1592-N, 2006 WL 905347, at *13 n.56 (Del. Ch. Apr. 3, 2006).  Section 9 does not satisfy this standard.  Section 9 provides that "[b]oth parties agree that any future projects done together will be covered by a specific Joint Development Agreement which will cover all Intellectual Property issues."  (CDA §9.)  Although the plain terms of the provision purport to require the parties to enter into a future JDA, Section 9 contains no material terms of the JDA, but rather leaves them to the whims of future negotiations which may never materialize and, as YRD alleges in the Complaint (Compl. ¶¶1, 33), did not.

The Complaint repeatedly alleges that Teknor knew at least one material term of the JDA—that YRD expected a royalty of $1.50 per product sold or 10% of Teknor's sales.  (*Id.* ¶¶1, 9, 20, 54, 86.)  Delaware law requires the Court to examine the words found in the CDA as the most objective indicia of the parties' shared intent.  *See Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) (footnotes omitted); *see also Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del. 1992) (under Delaware law, interpretation of a contract is a question of law).  The Court may also consider all deeds given the

attendant circumstances and objectives the parties attempted to attain.  *See Black Horse Capital, LP v. Xstelos Holdings, Inc*., No. 8642-VCP, 2014 WL 5025926, at *12  (Del. Ch. Sept. 30, 2014).  Even accepting the truth of YRD's allegations, Section 9's express terms do not use the term "royalty," nor otherwise refer to YRD's expected royalty.  YRD's allegations that Teknor "acknowledged" or was "aware" of YRD's expected royalty after the execution of the CDA, (Compl. ¶¶9, 54, 86), cannot plausibly show that the parties intended the royalty term to be an enforceable obligation under the CDA.  Under Delaware law, it is overt manifestation of assent at the time an agreement is made that controls the formation of a contract, not "after-the-fact professed subjective intent."  *See Black Horse Capital, LP*, 2014 WL 5025926, at *12 (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)).  Although YRD alleges that it communicated its expected royalty term before the CDA was executed (Compl. ¶9), the CDA expressly "supersedes all prior agreements between the parties with respect to its subject matter."  (CDA §12(g).) The Complaint and Section 9 fail to plausibly show that any material terms of the JDA were ever agreed upon.

YRD's arguments to the contrary (ECF No. 22 at 21–22) are misplaced.  First, while it is true that Delaware law may enforce an express contractual promise to negotiate in good faith even where the rest of the contract is unenforceable, YRD points to no express contractual promise by Teknor to negotiate a JDA in good faith, nor does the CDA contain one.  *See Transocean Group Holdings Pty Ltd. v. South Dakota Soybean Processors, LLC*, 663 F. Supp. 2d 731, 741 (D. Minn. 2009) (provision specified that the "parties agree to negotiate in good faith the terms and conditions of a formal Stockholders Agreement")*; see also SIGA Techs., Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 337 (Del. 2013) (similar); *Gillenardo v. Connor Broad. Del. Co*., No. 98C-06-015 WLW, 2002 WL 991110, at *5, 6 (Del. Super. Ct. Apr. 30, 2002) (express contractual obligation to "attempt in good faith to finalize the Sale Agreement").  Second, YRD's reliance on *Echols v. Pelullo*, 377 F.3d 272

(3d Cir. 2004), is unavailing. Unlike in *Echols*, Teknor does not challenge the validity of the entire CDA as an unenforceable agreement to agree based on Section 9, *see id.* at 275–76, but rather specifically challenges Section 9. It is that provision which purports to require the parties to agree to a JDA for any future projects without specifying all material terms of the JDA. Accordingly, the Court dismisses YRD's breach of contract claim premised on Section 9.[3]

## C. Count 2: Teknor's Alleged Misappropriation of YRD's Trade Secrets

Teknor argues that Count 2 should be dismissed because it fails to plausibly plead misappropriation of trade secrets. (ECF No. 16-1 at 17–21.) To plead a claim under the Delaware Uniform Trade Secrets Act ("DUTSA"), a plaintiff must allege that: (1) a trade secret existed; (2) the trade secret was communicated by the plaintiff to the defendant; (3) such communication occurred pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) the trade secret was improperly used or disclosed by the defendant to the injury of the plaintiff. *See Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 662 (D. Del. 2008); *Savor, Inc. v. FMR Corp.*, No. 00C-10-249-JRS, 2001 WL 541484, at *8–9 (Del. Super. Ct. Apr. 24, 2001). Teknor argues that YRD has failed to plead sufficient factual allegations supporting the existence of any trade secrets which Teknor misappropriated. The Court agrees with Teknor in part as to certain alleged trade secrets. YRD, however, has sufficiently pleaded the existence of some trade secrets that were misappropriated by Teknor.

---

[3] Other district courts have dismissed breach of contract claims that are premised on unenforceable agreements to agree under other states' laws. *See, e.g., Senter v. JPMorgan Chase Bank, N.A.*, 810 F.Supp.2d 1339, 1351–52 (S.D. Fla. 2011) (alleged agreement was an unenforceable agreement to agree under Florida law because plaintiffs failed to adequately plead essential terms of the agreement); *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, LP*, 235 F. Supp. 2d 485, 490–93 (E.D. Va. 2002) (unenforceable agreement to agree under Virginia law).

17cv1290

1      **1.      YRD Has Pleaded the Existence of Some Trade Secrets, But**

2           **Not Others**

3      The Court first considers Teknor's argument that YRD has failed to plead the

4  existence of a trade secret.  (ECF No. 16-1 at 17–19.)  Under the DUTSA, a "trade

5  secret" is "information, including a formula, pattern, compilation, program, device,

6  method, technique or process, that (a) derives independent economic value, actual or

7  potential, from not being generally known to, and not being readily ascertainable by

8  proper means by, other persons who can obtain economic value from its disclosure

9  or use; and (b) is the subject of efforts that are reasonable under the circumstances to

10  maintain its secrecy."  6 Del. C. §2001(4).

11      A plaintiff faces a quandary in pleading trade secrets under the DUTSA.  On

12  the one hand, "[c]ourts are in general agreement that trade secrets need not be

13  disclosed in detail in a complaint alleging misappropriation for the simple reason that

14  such a requirement would result in public disclosure of the purported trade secrets."

15  *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F. Supp. 635, 636 (D. Del.

16  1991); *see also Orthovita, Inc. v. Erbe*, No. 07-2395, 2008 WL 423446, at *9 (E.D.

17  Pa. Feb. 14, 2008); *AutoMed Technologies, Inc. v. Eller*, 160 F. Supp. 2d 915, 921

18  (N.D. Ill. 2001).  Moreover, because it is the defendant who knows what it

19  misappropriated, a plaintiff should not be required to plead with specificity all of its

20  possible trade secrets in order to proceed to discovery.  *See T-Mobile USA, Inc. v.*

21  *Huawei Device USA, Inc.*, 115 F. Supp. 3d 1184, 1193 (W.D. Wash. 2015).  On the

22  other hand, "courts generally require sufficient pleading such that the other party is

23  on notice of what it is alleged to have misappropriated."  *BlueEarth BioFuels, LLC*

24  *v. Hawaiian Elec. Co., Inc.*, 780 F. Supp. 2d 1061, 1078 (D. Haw. 2011); *see also*

25  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) ("[A]

26  plaintiff who seeks relief for misappropriation of trade secrets must identify the trade

27  secrets and carry the burden of showing that they exist.").  This pleading requirement

28  also prevents a plaintiff from "tak[ing] unfair advantage of the UTSA," and

"proceed[ing] on a flimsy basis" at the outset of a litigation only to "tailor[] its identification of trade secrets to the discovery it receives." *T-Mobile USA, Inc.*, 115 F. Supp. 3d at 1193.

YRD makes multiple allegations that may support its trade secret misappropriation claim, which can be grouped into three categories: (a) YRD's new compact hose concept and designs, (b) YRD's business strategy for selling its products, and (c) YRD's marketing ideas and sales information.  In considering whether YRD's allegations regarding this information are sufficient to plead the existence of trade secrets, the Court views judicial interpretation of the UTSA more generally as relevant and persuasive guidance.  *See* 6 Del. C. §2008 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); *Accenture Global Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 662 n.6 (D. Del. 2008).

### a.    YRD's Concept and Designs for a New Compact Hose

First, YRD alleges that it developed a "new concept" and a "revolutionary approach to build[ing] a compact hose." (Compl. ¶¶16, 18, 23.)  Teknor asserts that YRD's alleged concept for a new compact hose fails to "rise to the level of a trade secret" based on the allegations.  (ECF No. 21 at 8.)  The Court does not agree.

YRD provides factual allegations describing how its concept "improved" on existing hoses in the market and identifies various attributes of its concept, including the use of protective sleeves at the connectors, a change in the design of the inner hose liner, and use of abrasion resistant outer casings.  (Compl. ¶¶17–18.)  Teknor's argument that YRD does not allege it knew how to manufacture or otherwise achieve its alleged concept for a new compact hose is unavailing.  (ECF No. 16-1 at 18.) Concepts have value independent of the product they eventually inspire.  *See Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 962 (C.D. Cal. 2011) (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 726 (7th Cir. 2003)).  For

1   that reason, "trade secrets may reside in confidential disclosures of concepts, or as
2   yet-untested, ideas for a new product or new process." *Id*. YRD's factual allegations
3   identifying an alleged new concept for a compact garden hose sufficiently plead a
4   trade secret.

5         Second, and contrary to Teknor's argument that the Complaint does not allege
6   YRD knew how to achieve its concept for a new compact hose, the Complaint
7   plausibly alleges the existence of trade secrets pertaining to the design of the new
8   compact hose. YRD alleges that it provided Teknor with "the new hose design with
9   multiple variations" including through "videos of new prototypes and samples",
10  various types of testing results, design techniques, and "new means to manufacture"
11  the hose. (Compl. ¶¶13–14, 16–17, 22–23.) YRD alleges that it provided Teknor
12  with information on production scenarios for variations of the new hose at Teknor's
13  request. (*Id*. ¶21.) These allegations sufficiently allege the existence of trade secrets.
14  *See, e.g., BioD, LLC v. Amnio Tech.*, *LLC*, No. 2:13-cv-1670-HRH, 2014 WL
15  268644, at *7–8 (D. Ariz. Jan. 24, 2014) (plaintiff pleaded manufacturing methods,
16  prototypes, and product design); *W.L. Gore & Associates, Inc. v. GI Dynamics, Inc.*,
17  No. CV-10-8088-PHX-GMS, 2010 WL 5184254, at *8 (D. Ariz. Dec. 15, 2010)
18  (same); *SOAProjects, Inc. v. SCM Microsys., Inc.*, No. 10-CV-01773-LHK, 2010 WL
19  5069832, at *10 (N.D. Cal. Dec. 7, 2010) (plaintiff pleaded products and designs).

20        The Complaint also contains allegations bearing on whether the alleged trade
21  secrets had economic value from not being generally known. YRD alleges that its
22  concept for a new compact hose "was not currently being marketed and was not
23  known in the industry outside of YRD." (Compl. ¶18.) YRD alleges that its new
24  concept hose "would have a huge competitive advantage over expanding hoses"
25  which had manufacturing defects and poor reputations among retailers and
26  consumers. (*Id*. ¶¶10, 16, 18.) Thus, YRD has plausibly alleged trade secrets that
27  derived actual or potential economic value from not being generally known. *See, e.g.*
28  *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 974 (D. Ariz. 2015).

Further, YRD alleges efforts to protect these alleged trade secrets by requiring Teknor to enter into the CDA and sharing its alleged trade secrets pursuant to its confidentiality provisions.  (Compl. ¶¶1, 11–12, 15, 18–19, 21, 26.)  Although the existence of a confidentiality agreement does not make information shared pursuant to it a trade secret, the existence of such an agreement is relevant to whether a party took reasonable steps to ensure secrecy of its alleged trade secrets.  *See MAI Sys. Corp.*, 991 F.2d at 521; *Vesta Corp. v. Amdocs Mgmt., Ltd.*, 80 F. Supp. 3d 1152, 1166 (D. Or. 2015).  As even Teknor recognizes, the CDA itself imposed stringent requirements on use and disclosure of confidential information received pursuant to its provisions.  Accordingly, YRD has sufficiently pleaded the existence of trade secrets based on its concept for a new hose and designs.[4]  Whether they in fact rise to the level of a trade secret is a question of fact for determination by a jury, not this Court on a motion to dismiss.  *See Savor, Inc. v. FMR Corp.*, No. 00C-10-149JRS, 2004 WL 1965869, at *7 (Del. Super. Ct. July 15, 2004).

### b.    YRD's Alleged Business Strategy

In addition to identifying its concept for a new hose and designs as potential trade secrets, YRD claims that its "business strategy" pertaining to how YRD sells its products was also a trade secret.  (*See* Compl. ¶42; ECF No. 18 at 25–26.)  Although YRD alleges that its business strategy was shared under the provisions of the CDA and was not generally known to the public (Compl. ¶43), the plausibility of this allegation is undermined by YRD's single factual allegation about the strategy.  YRD alleges that its "business strategy" consisted of selling its hose products quickly through QVC online followed by sales through brick and mortar retailers, and that it

---

[4] Teknor relies heavily on *Accenture Global Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654 (D. Del. 2008), to argue that YRD has failed to plead the existence of trade secrets.  That case turned on whether the allegations showed misappropriation, not whether the allegations showed the existence of trade secrets.  *Id.* at 663–64.  Indeed, the court found sufficient the plaintiff's "basic description" of its trade secrets.  *Id.* 663 n.9.

experienced great success in selling its earlier products with this strategy.  (*Id.* ¶46.) Assuming the truth of this allegation, the Court is hard pressed to see how this strategy, as pleaded, could plausibly constitute a trade secret even if it was shared with Teknor under the provisions of the CDA. "[D]isclosure to the public through marketing and sales . . . is fatal to the existence of a trade secret."  *See Kavanagh v. Tuller*, No. 16-cv-01937-H (BGS), 2017 WL 1496436, at *4 (S.D. Cal. Apr. 26, 2017).  Without further factual allegations describing efforts to maintain the secrecy of this strategy, it appears that a zealous competitor could easily ascertain or reverse engineer through public information the core of YRD's alleged business strategy regarding when and where YRD sold its prior products.  Such an ability defeats the existence of a trade secret.  *See id.*; *see also Atlantic Medical Specialists, LLC v. Gastroenterology Associates*, No. N15C-06-245 CEB, 2017 WL 1842899, at *9 (Del. Super. Ct. Apr. 20, 2017) ("information is not misappropriated when it is readily ascertainable by reverse engineering") (internal quotations omitted); *Savor, Inc.*, 2004 WL 1965869, at *6 (information "clearly in . . . the public domain" at time of alleged misappropriation is not a trade secret).  The Complaint otherwise lacks plausible factual allegations that Teknor misappropriated the alleged strategy.  YRD merely alleges that Teknor knew the strategy (Compl. ¶46), but fails to provide further factual allegations showing misappropriation.  Mere knowledge, without more, is not sufficient to raise an inference of trade secret misappropriation under Delaware law.  *See* 6 Del. C. §2001(2).  YRD does not allege that Teknor's business model for the Zero-G Hose utilized YRD's business strategy in any way.  The Court finds that YRD's trade secrets misappropriation claim must be dismissed to the extent it is premised on YRD's "business strategy."

### c.   YRD's Marketing Ideas and Sales Information

Finally, YRD alleges it provided Teknor with (1) "marketing ideas" and (2) "sales sheets" and "sales data."  (Compl. ¶¶15, 17).  YRD has failed to plead factual allegations about this information that would support a trade secrets misappropriation

1   claim.

2        First, courts recognize that sales data may constitute a trade if it is not readily

3   ascertainable from a public source but instead developed with a substantial amount

4   of time, effort, and money.  *See SBS Worldwide, Inc. v. Potts*, No. 13 C 6557, 2014

5   WL 499001, at *4 (N.D. Ill. Feb. 7, 2014); *Mintel Int'l Grp., Ltd. v. Neergheen*, No.

6   08-cv-3939, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010).  The Complaint

7   contains no factual allegations showing that the sales sheets and data YRD allegedly

8   shared with Teknor were not readily ascertainable from public sources or developed

9   through substantial efforts by YRD.  Furthermore, the Complaint lacks factual

10   allegations connecting Teknor's allegedly unlawful commercialization of the Zero-

11   G Hose to YRD's sales sheets and data.

12        Second, YRD has failed to plead that its "marketing ideas" are trade secrets.

13   Courts recognize that various types of marketing-related information, such as

14   marketing plans, market analysis, and marketing activities, may constitute a trade

15   secret.  *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) (marketing

16   plan); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1117 (Fed. Cir. 1996)

17   (market analysis information); *Mintel Int'l Grp., Ltd.*, 2010 WL 145786, at *11

18   (marketing activities).  However, the Complaint references only the attributes of

19   YRD's compact hose concept and not any marketing ideas.  (Compl. ¶¶17, 27.)  To

20   the extent YRD's "marketing ideas" mean its "business strategy" regarding

21   marketing to QVC, the Court has already rejected this theory.  Furthermore, YRD

22   has not alleged that Teknor used or disclosed its marketing ideas in its

23   commercialization of the Zero-G Hose.  Although YRD refers to Teknor's

24   promotional information related to the Zero-G Hose (*id.* ¶27), the focus of the

25   allegation is on Teknor's alleged use of certain attributes of YRD's concept and

26   design for a compact hose, not Teknor's use of YRD's alleged marketing ideas to

27   market the Zero-G Hose.  Accordingly, YRD's trade secrets misappropriation claim

28   is dismissed to the extent it relies on nebulous allegations of "marketing ideas," or

alleged misappropriation of sales sheets and data.

### 2. YRD Has Pleaded Misappropriation of its Compact Hose Concept and Design by Teknor

The Court next considers Teknor's argument that YRD has failed to plead misappropriation of the compact hose concept and design.  Teknor argues that YRD must affirmatively show how the Zero-G Hose incorporates this concept and design. (ECF No. 16-1 at 20.)   The Court does not agree and finds sufficient YRD's allegations.

To support its misappropriation claim, YRD must plead that Teknor acquired its trade secrets through improper means, or unlawfully used or disclosed its trade secrets.  6 Del. C. §2001(2)(a)–(b); *see also Savor, Inc.*, 2004 WL 1965869, at *8. "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 6 Del. C. §2001(1).  The scope of what might constitute misappropriation is broad.  "Misappropriation includes not only wholesale pirating of an ideas, but also the unauthorized utilization of an idea as a starting point or guide in developing a process or as a means to understand what pitfalls to avoid." *See Savor*, *Inc.*, 2004 WL 1965869, at *8 (internal quotations omitted); *see also Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 944 (7th Cir. 1996) ("[I]f trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed.").  YRD alleges two types of misappropriation by Teknor.   First, YRD alleges that the Zero-G Hose utilizes YRD confidential information that Teknor did not know before its relationship with YRD and could not have known given its alleged lack of prior relevant experience.  (Compl.  ¶¶2, 7–8, 25–26, 34, 46.)   Second, YRD alleges that Teknor disclosed its trade secrets, as incorporated into its Zero-G Hose, to specifically named third party retailers without YRD's consent.  (*Id.* ¶¶36, 46.)  Allegations of such conduct fall squarely within the

DUTSA's ambit.   Teknor's challenge turns on whether YRD has supported this alleged misappropriation with factual allegations.

Teknor's argument that YRD must affirmatively show in its pleadings how the Zero-G Hose's development, distribution, or marketing incorporated each of YRD's alleged trade secrets is premised on a standard that is simply not required at the pleading stage given the realities of trade secrets misappropriation.[5]   A plaintiff is in a precarious position when it seeks to hold another party accountable for trade secrets misappropriation.   On the one hand, it is not common for a plaintiff to know, prior to discovery, the details surrounding an alleged theft of trade secrets.   *Accenture*, 581 F. Supp. 2d at 661.   Indeed, a plaintiff "may have minimal facts available to it at the pleading stage." *Id.* at 662.   Courts recognize that a plaintiff oftentimes will not have direct evidence of misappropriation, but rather only circumstantial evidence—even after discovery is completed. *See Savor*, *Inc.*,  2004 WL 1965869, at *8 ("[I]t is now well-settled that the plaintiff may prove misappropriation of trade secrets with circumstantial evidence."); *see also Computer Sciences Corp. v. Computer Associates, Int'l, Inc.*, Nos. CV 98–1374–WMB SHX, CV 98–1440–WMB SHX, 1999 WL 675446, at *12 (C.D. Cal. Aug. 12, 1999) ("[D]irect evidence of trade secret misappropriation is often hard to come by, and . . . misappropriation may therefore be inferred from ambiguous circumstantial evidence . . .").   It follows that a complaint may similarly rely on circumstantial allegations of a defendant's misappropriation.   On the other hand, a court must strike a balance between that reality and the fair notice Rule 8 requires.   *Accenture*, 581 F. Supp. 2d at 662.   A court will not permit a plaintiff "to conduct a fishing expedition based upon . . . bare allegations" of misappropriation.   *Id.* at 663; *see also T-Mobile USA, Inc.*, 115 F.

---

[5] Teknor's reliance on *XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157-RGA, (D. Del. Mar. 8, 2013), is misplaced.  The court was considering a motion for summary judgment and expressly applying Rule 56's evidentiary standard, which does not apply at the motion to dismiss stage.

Supp. 3d at 1193.  Thus, if a plaintiff seeks to plead trade secrets misappropriation based on circumstantial allegations, the allegations must still "be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555; *see also SOAProjects*, 2010 WL 5069832, at *11 (finding trade secrets misappropriation claim plausible based on "circumstantial allegations" of misappropriation).

The Complaint contains more than "bare allegations" of Teknor's alleged misappropriation.  YRD alleges that Teknor did not know how to build a compact hose and was not in the business of compact hoses when it approached YRD in 2014. (Compl. ¶¶7–8, 27.)  YRD shared with Teknor, and Melo specifically, its concept for a new compact hose and designs, pursuant to a CDA requiring Teknor to protect confidential information it received and limiting its use by Teknor.  (*Id.* ¶¶13–17, 21.)  YRD also informed Teknor that it intended to commercialize a hose with changed interior design based on the confidential information it was providing to Teknor.  (*Id.* ¶18.)  Teknor indicated it wanted to commercialize such a concept too, requesting additional information from YRD.  (*Id.* ¶¶19, 21.)  Teknor subsequently went silent with YRD and disavowed any new product development outside of its core business.  (*Id.* ¶24.)  Meanwhile, through 2015, Teknor allegedly developed its Zero-G Hose based on confidential information YRD provided and established sales channels with retailers for the hose.  (*Id.* ¶¶1, 26–27, 32, 40, 46.)  The promotional information for the Zero-G Hose incorporates attributes of YRD's concept.  (*Id.* ¶27.)  YRD further alleges that Teknor has gained a "huge competitive advantage" by rolling out the Zero-G Hose based on YRD's confidential information.  (*Id.* ¶¶ 28, 40.)   These allegations sufficiently identify the contours of Teknor's alleged misappropriation and are substantial enough to justify opening the door to discovery. *See, e.g., Spears Pharm., Inc. v. William Blair & Co., LLC*, 610 F. Supp. 2d 278, 283 (D. Del. 2009).  Accordingly, the Court denies Teknor's motion to dismiss Count 2 insofar as it concerns alleged misappropriation of YRD's compact hose concept and designs.

### D.    DUTSA Preemption of Certain Claims

Teknor argues that the Court should dismiss YRD's claims for unjust enrichment (Count 3), conversion (Count 4), and unfair competition (Count 6) as statutorily preempted by the DUTSA and the California Uniform Trade Secret Act ("CUTSA"). (ECF No. 16-1 at 9.)  In response, YRD argues that preemption under the DUTSA or CUTSA cannot be assessed at the pleading stage, but even if it can, the claims are not preempted because they seek to vindicate contractual rights under the CDA.  (ECF No. 22 at 12.)  Because the Court has determined that Delaware law governs YRD's tort law claims, the Court only considers whether the DUTSA preempts Counts 3, 4, and 6.

### 1.    The Scope of the Preemption Inquiry

The DUTSA "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret."  6 Del. C. §2007(a).  Section 2007 was intended to "make uniform the law with respect to" trade secrets and to "preserve a single tort cause of action under state law for misappropriation" and "thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation."  *Osco v. Motors Co., LLC v. Marine Acquisition Corp.*, No. 13-868-RGA/MPT, 2014 WL 2875374, at *13 (D. Del. June 24, 2014); *Leucadia*, *Inc.*, 755 F. Supp. at 637.  Section 2007's displacement provision, in relevant part, "does not affect (1) [c]ontractual remedies, whether or not based upon misappropriation of a trade secret," or "(2) [o]ther civil remedies that are not based upon misappropriation of a trade secret."  6 Del. C. §2007(b).  The relevant inquiry for determining whether a civil claim is subject to preemption under the DUTSA is whether the claim is "grounded in the same facts which purportedly support the misappropriation of trade secrets claim."  *Savor*, *Inc.*, 2001 WL 541484, at *4.  The Court should inquire whether the failure of the misappropriation claim "would doom the common law claim."  *Ethypharm S.A. France v. Bentley Pharms., Inc*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (citing *Smithfield Ham & Prods. Co. v.*

1   *Portion Pac, Inc*., 905 F. Supp. 346, 350 (E.D. Va. 1995)).  Where a civil claim is

2   based on the same facts as a trade secrets misappropriation claim, it is preempted

3   under the DUTSA.  *Savor, Inc.*, 2001 WL 541484, at \*4.

4        Relying on *Amron International Diving Supply, Inc. v. Hydrolinx Diving*

5   *Communication, Inc.*, No. 11-cv-1890-H (JMA), 2011 WL 5025178 (S.D. Cal. Oct.

6   21, 2011), YRD argues that the Court cannot undertake the preemption inquiry at the

7   motion to dismiss stage.  (ECF No. 22 at 12.)  In *Amron*, the court intimated that the

8   defendants' preemption argument "cannot be addressed until it is determined whether

9   the allegedly misappropriated information constitutes a trade secret" because at the

10   pleading stage "the status of information is merely a matter of allegation."  *Id*. at

11   \*10.[6]   The authorities on which the *Amron* court relied similarly contend that

12   preemption on the pleadings is generally not proper because the ultimate status of the

13   information is unknown.  *See Genzyme Corp. v. Bishop*, 463 F. Supp. 2d 946, 949

14   (W.D. Wis. 2006) (court lacked "sufficient factual information" based on pleadings

15   "to conclude as a matter of law" that the allegedly received and retained information

16   constituted a trade secret); *Callaway Golf Co. v. Dunlop Slazenger Grp. Am., Inc*.,

17   295 F. Supp. 2d 430, 437 (D. Del. 2003) ("[I]t has not been established that the

18   information at issue may be classified as trade secrets.  At this point, the status of the

19   information is merely a matter of allegation."); *Stone Castle Fin. v. Friedman,*

20   *Billings, Ramsey & Co*., 191 F. Supp. 2d 652, 658–659 (E.D. Va. 2002) ("[W]here

21   courts have found preemption on a motion to dismiss, they repeatedly establish that

22   the information in issue–as alleged–constitutes trade secrets before reaching the

23   preemption question."); *Combined Metals of Chicago Ltd. P'ship v. Airtek, Inc*., 985

24   F. Supp. 827, 830 (N.D. Ill. 1997) (permitting breach of fiduciary duty claim because

25

26        [6] The court, however, had already rejected the defendants' argument that the

27   CUTSA displaced several common law claims because those claims "do not allege
claims for relief that were based on identical facts as those claimed in [the plaintiff's]

28   misappropriation of trade secrets."  *Amron*, 2011 WL 5025178, at \*10.  Thus, the
court's preemption discussion appears to be dicta.

it was not clear based on allegations whether die and design specifications would qualify as a trade secret).

In contrast, Teknor argues that the potential status of the allegedly misappropriated information is irrelevant because preemption extends to common law claims premised on information that falls short of a trade secret. (ECF No. 21 at 3.) Case law supports this position. For example, in *Ethypharm S.A.*, the court determined that "[b]ecause all claims stemming from the same acts as the alleged misappropriation are intended to be displaced, a claim can be displaced even if the information at issue is not a trade secret." 388 F. Supp. 2d at 433. As such, "a determination of whether the information at issue constitutes a trade secret under the DUTSA need not be addressed prior to making a determination of displacement." *Id*. Courts have reasoned that in enacting the DUTSA, the Delaware Legislature decided to make unlawful only misappropriation of statutory trade secrets. *See id.; Leucadia, Inc.*, 755 F. Supp. at 637; *see also Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co*., 270 F. Supp. 2d 943, 949 (W.D. Mich. 2003). The Court finds persuasive this broader approach to preemption. The DUTSA is Delaware's enactment of the Uniform Trade Secrets Act ("UTSA"), which contains identical preemption provisions. *See Atl. Med. Specialists*, 2017 WL 1842899, at *15 ("Because Delaware's version is *in pari materia* with the provision promulgated in the UTSA, at least as to this [preemption] dispute, they may be referenced interchangeably. . .") The UTSA preemption provision has generally been interpreted to abolish all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade secret status. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) ("[UTSA] has abolished all common law theories of misuse of [secret] information. Unless defendants misappropriated a (statutory) trade secret, they did no legal wrong."); *Hauck Mfg. v. Astec Indus*., 375 F. Supp. 2d 649, 654–55 (E.D. Tenn. 2004). Permitting otherwise displaced tort claims to proceed simply because the

information may not rise to the level of a trade secret would defeat the purpose of the UTSA. *See Atl. Med. Specialists*, 2017 WL 1842899, at *14. Delaware courts apply this approach when determining whether claims are displaced under the DUTSA. *Id.* at *15 ("Delaware has joined the 'majority view' that section 7 of UTSA precludes claims based on misappropriation of business information even in cases in which the claim does not meet the statutory definition of 'trade secret'. . .); *see also Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del. 2002) (rejecting argument that trial court's dismissal of common law claims was premature because the "common law claims seek civil remedies based solely on the alleged misappropriation of a trade secret."). Accordingly, YRD's common law claims will be preempted under the DUTSA if they are grounded in the same facts that support YRD's trade secrets misappropriation claim regardless of whether the information would ultimately rise to the level of a trade secret.

### 2. Counts 4 and 6 Are Preempted, but Count 3 is Not

As a preliminary matter, relying on *Atlantic Medical Specialists*, 2017 WL 1842899, YRD argues that none of its claims are preempted because they seek to vindicate contractual rights under the CDA. In *Atlantic Medical Specialists*, the court permitted a tortious interference with contract claim, premised on an alleged inducement to violate a contractual confidentiality provision, to proceed despite DUTSA's civil remedies displacement provision. *Id.* at *12, 16. However, unlike the tortious interference with contract claim at issue in *Atlantic Medical Specialists*, a claim which expressly required the existence of contract, claims for unjust enrichment, conversion, and unfair competition generally do not require the existence of a contract, nor have courts considered them to provide "contractual remedies" within the scope of UTSA's exemption of such remedies from displacement. *See, e.g., New South Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 533 n.6 (S.D. Miss. 2013) (collecting cases showing that a majority of courts have found conversion claims preempted under displacement provisions of the UTSA); *Office*

*Home Depot, Inc. v. Impact Office Products., LLC*, 821 F. Supp. 2d 912, 922 (N.D. Ohio 2011) ("UTSA expressly preempts this time of 'restitutionary' remedy" of unjust enrichment); *Savor*, *Inc.*, 812 A.2d at 898 (unfair competition claim preempted under DUTSA displacement provisions). A party cannot save a common law claim from preemption by merely asserting that the claim seeks to vindicate a contractual right although the common law claim itself does not require the existence of a contract. Interpreting Section 2007(b)(1)'s exemption of contractual remedies so broadly would eclipse the DUTSA's otherwise broad displacement of conflicting tort and restitutionary law providing civil remedies for trade secret misappropriation. The Court, therefore, rejects YRD's argument.[7]

The Court finds that Counts 4 and 6 are preempted by the DUTSA because they are grounded in the same facts underlying YRD's trade secrets misappropriation claim. Count 4, YRD's conversion claim, is specifically premised on Teknor's alleged misuse of information shared under the CDA and resulting detriment to YRD, (Compl. ¶¶58–61), and is therefore "clearly preempted" under the DUTSA. *See UD Tech. Corp*. *v. Phenomenex, Inc*., No. 05-842-GMA, 2007 WL 28295, at *9 (D. Del. Jan. 4, 2007). Likewise Count 6 is premised on YRD's use of information shared under the CDA and Teknor's alleged gain of an "unfair competitive advantage over YRD" as a result of its conduct (Compl. ¶75)—an allegation identical to YRD's allegation in its trade secrets misappropriation claim (*id.* ¶47). Notably, YRD's unfair competition claim expressly turns on its trade secrets misappropriation claim.

---

[7] The Court also finds YRD's argument unpersuasive for another reason as to Counts 3 and 4. YRD cannot avoid DUTSA preemption of these claims by arguing that they seek to vindicate contractual rights when these claims may themselves be displaced by the existence of a contractual remedy. *See, e.g.*, *Khushaim v. Tullow, Inc.*, No. N15C-11-212-PRW, 2016 WL 3594752, at *7–8 (Del. Super. Ct. June 27, 2016) (under Delaware law, conversion claims are displaced where a valid contract provides a remedy); *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, No. Civ. A. 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007) (unjust enrichment claims are displaced where a valid contract provides a remedy).

YRD expressly alleges that "[YRD] will suffer irreparable harm at the hand of [Teknor] unless [Teknor is] enjoined from utilizing YRD *trade secrets* or distributing products developed from YRD *trade secrets*." (*Id.* ¶79 (emphasis added).) Courts have dismissed unfair competition claims on preemption grounds where such claims are "grounded in the same facts which purportedly support the Misappropriation of Trade Secrets claim" under the DUTSA. *Savor, Inc.*, 2001 WL 541484, at *4; *see also Leucadia, Inc.*, 755 F. Supp. at 636–37. If the Court disregarded the alleged misuse of confidential information to assess the sufficiency of YRD's conversion and unfair competition claims, the claims would otherwise lack sufficient factual matter to state a claim that is plausible on its face. *See BlueEarth BioFuels*, 780 F. Supp. 2d at 1074 ("If this cause of action does not relate to the unlawful retention of trade secrets or confidential information, as Plaintiff represents, there are simply insufficient facts to state a claim for relief that is plausible on its face. . .."). The Complaint is devoid of other allegations, independent of Teknor's alleged misuse of confidential information, which could support these claims. Accordingly, the Court grants Teknor's motion to dismiss Counts 4 and 6 as preempted.

However, the Court finds that YRD's unjust enrichment claim (Count 3) is in part not preempted under the DUTSA. Count 3 in part concerns confidential information shared under the CDA with Teknor (Compl. ¶52). To the extent the claim rests on Teknor's alleged misappropriation of such information, the claim is grounded in the same facts as YRD's trade secrets misappropriation claim and is preempted by the DUTSA. *See Office Home Depot, Inc.*, 821 F. Supp. 2d at 922 (finding partial preemption of unjust enrichment claim). However, YRD alleges other facts in support of the claim, specifically that Teknor was unjustly enriched by failing to enter into the JDA with YRD. (Compl. ¶¶53–54.) YRD's misappropriation claim otherwise neither makes an express reference to the JDA, nor Teknor's failure to enter into it. (*See generally id.* ¶¶41–50.) The failure of YRD's misappropriation claim will not doom its claim that Teknor was unjustly enriched by failing to enter

into the JDA.  Accordingly, the Court denies Teknor's motion to dismiss Count 3 on this basis.

> **E.      Displacement of Counts 3 and 4 by Alleged Breaches of the CDA**

Teknor argues that YRD's breach of contract claim "independently displaces" Counts 3 and 4 because the claims arise from Teknor's alleged breach of the CDA. (ECF No. 16-1 at 9.)  Although the Court has found that YRD's conversion claim is subject to preemption under the DUTSA, the Court will also address Teknor's argument that the claim is independently displaced by YRD's breach of contract claim.  The Court finds that although the unjust enrichment claim is not displaced by YRD's breach of contract claim, the conversion claim is independently displaced by it.

> **1.      YRD's Unjust Enrichment Claim is Not Displaced**

In Count 3, YRD alleges that Teknor was unjustly enriched by failing to enter into a JDA with YRD while retaining the benefit and profits of highly valuable confidential information it received from YRD through its solo commercialization of the Zero-G Hose.  (Compl. ¶¶52–56.)  Although Teknor has argued that the CDA did not obligate Teknor to negotiate a JDA, Teknor asserts that the YRD's corresponding breach of contract claim under the CDA displaces the unjust enrichment claim.  (ECF No. 16-1 at 11.)  In response, YRD argues both that the CDA obligated Teknor to negotiate a JDA and, if that obligation is not an enforceable contractual provision, it can alternatively sue Teknor for unjust enrichment based on a failure to enter a JDA. (ECF No. 22 at 16.)

Under Delaware law, "[u]njust enrichment is defined as the unjust retention of a benefit to loss of another, or the retention of money or property of another against fundamental principles of justice or equity and good conscience." *Shock v. Nash*, 732 A.2d 217, 232 (Del. 1999).  It requires: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law. *U.S. Bank*

*Nat'l Ass'n v. Gunn*, Civ. No. 11-CV-1155-RGA, 2015 WL 4641611, at \*5 (D. Del. Aug. 5, 2015). Before reaching the elements of an unjust enrichment claim, a court must satisfy itself that no contract already governs the relevant relationship between the parties. Where the complaining party has a legal remedy by virtue of a contract with the party alleged to have been enriched, "the contract remains 'the measure of [the] plaintiff's right.'" *MetCap Secs. LLC v. Pearl Senior Care, Inc*., No. Civ. A. 2129-VCN, 2007 WL 1498989, at \*5 (Del. Ch. May 16, 2007); *Res. Veterans, Inc. v. Res. Mgmt. Int'l, Inc*., 42 F. Supp. 2d 423, 439 (D. Del. 1999). In some situations, an unjust enrichment claim may survive a motion to dismiss when pleaded as an alternative theory, but that "does not obviate the need for the plaintiff to provide sufficient factual allegations" to support the claim. *See BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp*., No. 3009-VCN, 2009 WL 264088, at \*7–8 (Del. Ch. Feb. 3, 2009).

Neither party disputes that the CDA was a valid contract that established a relationship between them concerning the sharing, disclosure, and use of confidential information. Notably, in support of its unjust enrichment claim, YRD alleges that Teknor was obligated to negotiate a JDA, (Compl. ¶53), but—unlike its breach of contract claim (*id.* ¶¶33, 37)—does not allege that such an obligation arose from the CDA. Thus, the unjust enrichment claim is an alternative to YRD's breach of contract claim. "Unjust enrichment is a quasi-contract theory of recovery to remedy the absence of a formal contract." *Res. Veterans, Inc*., 42 F. Supp. 2d at 439 (citing *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*, No. 94C-03-189-WTQ, 1997 WL 529587, at \*17 (Del. Super. Ct. Jan. 29, 1997)). YRD's alternative pleading is particularly fortuitous in light of this Court's determination that the JDA was nothing more than an unenforceable agreement to agree. The CDA does not otherwise address the precise relationship underlying YRD's unjust enrichment claim: Teknor's compensation to YRD for use of YRD's confidential information in the event the parties did not enter into a JDA, or jointly develop a product. Therefore, the CDA

cannot be the measure of YRD's remedy.  *See Narrowstep, Inc. v. Onstream Media Corp.*, No. 5114-VCP, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010) (finding that unjust enrichment claim was a "viable, alternative remedial theory" where it was in part unclear that the agreement "comprehensively governs . . . ownership rights to, and proceeds from" confidential information).   Accordingly, YRD's breach of contract claim does not displace Plaintiff's unjust enrichment claim.   The Court denies Teknor's motion to dismiss this claim.

### 2.    YRD's Conversion Claim is Displaced

In Count 4, YRD alleges that Teknor converted confidential information shared under the CDA, resulting in harm to YRD.  (Compl. ¶¶58–61.)  Although the Court has found that this claim is preempted under the DUTSA, Teknor argues that this claim is independently subject to dismissal in light of YRD's breach of contract claim.   The Court agrees.   Under Delaware law, "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it, is a conversion . . ."  *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933).  To state a claim for conversion, a plaintiff must establish a property interest in the converted goods, the right to possess the goods, and damages.  *J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F. Supp. 2d 449, 459 (D. Del. 2013); *Hurst v. City of Dover*, No. 04-083 GMS, 2008 WL 2421468, at *4 (D. Del. June 16, 2008).  "[W]here a claim for conversion arises solely from a breach of contract, a plaintiff must allege that a defendant violated a legal duty independent from his contractually-imposed duties." *Moon Express, Inc. v. Intuitive Machs., LLC*, No. 16-344-LPS-CJB, 2017 U.S. Dist. LEXIS 155487, at *35 (D. Del. Sept. 22, 2017).  The Complaint alleges that the property Teknor converted was confidential information YRD shared under the CDA.  (Compl. ¶¶58–60.)  In opposition, YRD itself emphasizes that the claim is grounded in the CDA.  (ECF No. 22 at 24.)  In order to sustain its claim for conversion, YRD must allege that Teknor violated a legal duty independent of Teknor's duties under the CDA.  The Complaint, however, fails to identify any legal

1    duty independent of Teknor's obligations under the CDA pertaining to use of that
2    information.   Accordingly, the Court grants Teknor's motion to dismiss YRD's
3    conversion claim as independently displaced by YRD's breach of contract claim.

4    **F.    Count 5:   YRD Has Not Plausibly Pleaded Interference with**
5    **Prospective Economic Advantage**

6        In Count 5, YRD alleges that Teknor intentionally usurped YRD's opportunity
7    to roll out its own new compact hose products, and seized the initiative for a
8    substantial market share of new compact hose sales.  (Compl. ¶68.)  "YRD was left
9    to compete with a product it had designed[]." (*Id*.)  YRD allegedly suffered damages
10   as a result.  (*Id*. ¶70.)  Teknor challenges this claim on the ground that YRD has failed
11   to plausibly allege it had a prospective economic advantage with which Teknor
12   interfered.  (ECF No. 16-1 at 14–15.)  The Court agrees.

13       In order to state a claim for tortious interference with prospective economic
14   advantage, Delaware law requires a plaintiff to allege facts establishing: (1) a
15   reasonable probability of a business opportunity, (2) intentional interference with that
16   opportunity, (3) proximate causation, and (4) damages.  *See eCommerce Indus., Inc.*
17   *v. MWA Intelligence, Inc*., No. 7471-VCP, 2013 WL 5621678, at *40 (Del. Ch. Oct.
18   4, 2013).).   Delaware courts "permit a broad range of legitimate business
19   expectancies, including the prospect of . . . [any] relations leading to potentially
20   profitable contracts," but the "mere hope" or "mere perception of a prospective
21   relationship or contract will not suffice."  *World Energy Ventures, LLC v. Northwind*
22   *Gulf Coast LLC*, No. N15C-03-241 WCC, 2015 WL 6772638, at *7 (Del. Super. Ct.
23   Nov. 2, 2015) (internal quotations omitted).  The factual allegations must identify a
24   party who was prepared to enter into a business relationship with the plaintiff, but
25   was dissuaded from doing so by the defendant.  *Agilent Techs., Inc. v. Kirkland*, No.
26   3512-VCS, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009).

27       YRD's intentional interference claim does not contain factual allegations
28   identifying opportunities with any entity, but rather refers only to "retailer sales

channels" and "market share" that YRD did not receive.  (*See generally* Compl.
¶¶66–72.)  Although it is true that a plaintiff need not provide the specific name of
the entity with which it had a reasonable probability of a business opportunity, *see
Agilent Techs., Inc.*, 2009 WL 119865, at \*7, YRD's undifferentiated and generalized
allegations are insufficient to survive a motion to dismiss.  *See Organovo Holdings,
Inc. v. Dimitrov*, 162 A.3d 102, 123 (Del. Ch. Ct. 2017); *cf. Kimbleton v. White*, No.
12-974-GMS, 2014 WL 4386760, at \*8 (D. Del. 2014) (allegations of interference
with "all prospective home buyers" insufficient to establish a reasonable probability
of business opportunity).  YRD argues in opposition that it had a reasonable
probability of business opportunities with Lowes, Home Depot, and other customers
who purchased Teknor's Zero-G Hose, rather than YRD's product.  (ECF No. 22 at
20.)  The Complaint, however, contains no factual details showing or supporting an
inference that YRD had a reasonable probability of a business opportunity with these
entities for its own hose.  The Court has also considered whether YRD's factual
allegations regarding its relationship with QVC support its intentional interference
claim.  The Court concludes they do not.  As YRD underscores in opposition, its
claim concerns Teknor's alleged interference with YRD's own "competing" hose.
(*Id.*)  The allegations pertaining to QVC do not concern that product, but rather the
hose YRD alleges it would have developed with Teknor which would have been
marketed through QVC.  (*Id.*; Compl. ¶¶10, 20, 24.)  Thus, allegations concerning
QVC do not support YRD's international interference claim as pleaded.
Accordingly, the Court grants Teknor's motion to dismiss this claim.

### G.    Count 7:  YRD Cannot Plausibly Claim that Teknor Breached the Implied Covenant of Good Faith and Fair Dealing

In Count 7, YRD alleges that Section 9 of the CDA and the implied covenant
of good faith and fair dealing obligated Teknor to negotiate a JDA with YRD by fall
2016.  (Compl. ¶¶84–85.)  At that point, YRD alleges that Teknor began to develop,
manufacture, and plan distribution of its Zero-G Hose based on confidential

information imparted by YRD.  (*Id.* ¶84.)  YRD alleges that under a JDA it would have received a royalty of $1.50 per product sold or on 10% of Teknor's sales.  (*Id.* ¶¶86–87.)   Teknor argues that the implied covenant claim should be dismissed because YRD fails to plead the existence of an implied obligation arising outside of the explicit terms of the CDA.  (ECF No. 16-1 at 15–16.)  The Court agrees that this claim must be dismissed.

"Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract." *Anderson v. Wachovia Mortg. Corp*., 497 F. Supp. 2d 572, 581 (D. Del. 2007).  In general, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co*., 878 A.2d 434, 442 (Del. 2005) (citations omitted).  In order to plead successfully a breach of the implied covenant, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.  *Fitzgerald v. Cantor*, Civ. No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).  As noted by the Delaware Supreme Court, "[a]pplying the implied covenant is a cautious enterprise and we will only infer contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Gerber v. Enter. Products Holdings, LLC*, 67 A.3d 400, 421 (Del. 2013), *overruled on other grounds by*, *Winshall v. Viacom Int'l, Inc*., 76 A.3d 808 (Del. 2013).  Where the express terms of a contract speak directly to the issue in dispute, those terms will always "supersede" the implied covenant.  *See Gerber*, 67 A.3d at 419; *Fortis Advisors, LLC v. Dialog Semiconductor PLC*, No. 9522-CB, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015) ("[I]mplied good faith cannot be used to circumvent the parties' bargain when the contract speaks directly to the issue.").

This Court has already determined that Section 9 constitutes an unenforceable agreement to agree and contains no express provision requiring Teknor to negotiate

a JDA in good faith.  The express terms of the CDA otherwise "do[] not require . . . either Party to proceed with any proposed transaction or relationship," (CDA §7(a)), and do not establish any "business relationship between the Parties, other than as expressly provided for," (*id.* §7(c)).  In light of these terms, YRD's "claim must fail because the express terms of the contract . . . control [the] claim." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

Also fatal to YRD's implied covenant claim is its allegation regarding Teknor's intentions "from the outset" of its discussions with YRD, (Compl. ¶27), which do not plausibly show Teknor would have agreed to the term YRD seeks to imply.  "To supply an implicit term, the court looks to the past and asks what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 184 (Del. Ch. 2014) (internal quotations omitted).  The implied covenant only applies where "it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter.'" *Cont'l Advisors S.A. v. GSV Asset Mgmt., LLC*, No. 14-cv-05609-YGR, 2015 WL 7720752, at *6 (N.D. Cal. Nov. 30, 2015) (quoting *Dunlap*, 878 A.2d at 442).  Although YRD alleges that the parties discussed expanding their business relationship, YRD also alleges that Teknor "planned from the outset to pirate YRD's confidential information for its own use in order to develop a competing compact hose" and "secretly schemed" to develop the Zero-G Hose alone.  (*Compare* Compl. ¶20 *with* ¶1, 27.)  Assuming the truth of YRD's allegations regarding Teknor's true intentions, an implied term under the CDA requiring Teknor to negotiate the JDA could not plausibly have made its way into the CDA.  *See Cont'l Advisors S.A.*, 2015 WL 7720752, at *6 ("Under plaintiffs' theory, defendants never intended for the contemplated transactions to occur. Therefore, a full negotiation regarding the proposed implied term . . . would certainly not have made its way as a negotiated term into the agreements in question.").

1   Accordingly, the Court dismisses with prejudice YRD's claim based on a breach of

2   the implied covenant of good faith and fair dealing.

3           **H.**        **Applicability of the DTSA to this Case**

4         Lastly, the Court addresses YRD's assertion that the Defend Trade Secrets Act

5   ("DTSA"), 18 U.S.C. §1831 *et seq*., supplies an additional federal cause of action for

6   Teknor's alleged misappropriation of its trade secrets.   The DTSA is the federal

7   analogue to state laws like the DUTSA.   Formally enacted on May 11, 2016, the

8   DTSA enables the owner of a trade secret to bring a private cause of action in federal

9   court for trade secret misappropriation.   *See* 18 U.S.C. §1836(b)(1).   The DTSA

10  defines misappropriation in several ways, including the "acquisition of a trade secret

11  of another by a person who knows or has reason to know that the trade secret was

12  acquired by improper means" or when one "disclos[es]" or "use[s]" another's trade

13  secret without the consent of the trade secret owner.   *Id*. §1839(5)(B); *Brand Energy

14  & Infrastructure Servs. v. Irex Contracting Grp*., No. 16-2499, 2017 WL 1105648,

15  at *3 (E.D. Pa. Mar. 24, 2017).   Unlike state trade secret laws, the DTSA has been

16  interpreted to apply to misappropriation of trade secrets that occurred before the

17  DTSA was enacted as long as the misappropriation continues to occur after the

18  enactment date.   *Id.* at *4.   Importantly, the DTSA generally does not "preempt or

19  displace any other remedies, whether civil or criminal, provided by . . . State . . . law

20  for the misappropriation of a trade secret. . ."   18 U.S.C. §1838.   Therefore, YRD

21  may bring both a claim under the DUTSA and the DTSA.

22        YRD has not specifically requested leave to amend the Complaint to allege

23  such a claim, but the Court believes that the prudent course is to treat YRD's

24  argument as such a request.   The Court cannot say that amendment would be futile

25  at this time.   *See Lockheed Martin Corp. v. Network Solutions, Inc*., 194 F.3d 980,

26  986 (9th Cir. 1999).   Because the Court has found that YRD sufficiently pleaded a

27  claim under the DUTSA for its compact hose concept and designs, the Court will

28  permit YRD to amend the Complaint to allege a cause of action under the DTSA.

## IV.    CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Teknor's Rule 12(b)(6) motion to dismiss the Complaint as follows:

1. The Court **DISMISSES WITHOUT PREJUDICE** YRD's claims for breach of contract (Count 1) as to alleged breaches of Sections 4(c), 4(d), and 4(f); conversion (Count 4); interference with prospective economic advantage (Count 5); and unfair competition (Count 6). YRD's claim of trade secrets misappropriation (Count 2) is dismissed to the extent it concerns YRD's alleged marketing ideas, sales information, and business strategy.

2. The Court **DISMISSES WITH PREJUDICE** YRD's breach of contract claim (Count 1) as to an alleged breach of Section 9, and YRD's claim for breach of the implied covenant of good faith and fair dealing (Count 7).

3. The Court **DENIES** Teknor's Motion to dismiss YRD's claim (Count 1) regarding alleged breaches of Sections 4(a), 4(b), and 4(g); trade secrets misappropriation claim (Count 2) insofar as it concerns alleged new compact hose concept and designs; and unjust enrichment (Count 3).

4. The Court **GRANTS** YRD leave to amend the Complaint to add a claim under the DTSA and cure any pleadings dismissed without prejudice. YRD may file an amended complaint **no later than December 22, 2017.** Teknor must answer or file a motion to dismiss those new portions of an amended complaint **no later than January 22, 2018**.

**DATED:  November 29, 2017**

Hon. Cynthia Bashant
United States District Judge

17cv1290